**WO** MGD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Prasant Patel,<br>Plaintiff,<br>v.<br>Dominique Vattuone,<br>Defendant. | No. CV-22-01852-PHX-MTL (MTM)<br><br>**ORDER** |

Plaintiff Prasant Patel brought this civil rights action under 42 U.S.C. § 1983 against Officer Dominique Vattuone of the Scottsdale Police Department. Defendant moves for summary judgment, and Plaintiff opposes the Motion. (Docs. 57, 62.)

## I. Background

In his Complaint, Plaintiff asserts claims of Fourth Amendment excessive force (Count One) and First Amendment retaliation (Count Two). (Doc. 1.) Plaintiff seeks compensatory and punitive damages, interest, costs and attorney's fees.

Defendant moves for summary judgment on the basis that (1) the force used was reasonable and justified and Defendant is entitled to qualified immunity on the excessive force claim; (2) probable cause existed for Plaintiff's arrest and there is no evidence to prove animus or retaliatory motive to support a First Amendment retaliation claim; and (3) judicial estoppel bars both claims. (Doc. 57.)

. . . .

. . . .

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). Where the evidence includes video footage, the Court considers the facts in the light depicted by the video but still draws all inferences from the video in Plaintiff's favor. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (a court may properly consider video

evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)). However, if a party's asserted facts clearly differ from the facts in the video, the Court must consider the facts as depicted by the video. *See Scott*, 550 U.S. at 380 ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

**III. Relevant Facts**

Defendant asserts that while he was on patrol in Scottsdale in the early morning hours of September 22, 2021, he was flagged down by a Casa Amigos bar and nightclub security guard who had escorted Plaintiff from the bar around 1:00 a.m. (Doc. 53 (Def.'s Statement of Facts) ¶ 1.) Plaintiff disputes that he was the person escorted from the bar, asserting that his cousin Shivan had been escorted from the bar and Plaintiff went outside voluntarily to check on Shivan. (Doc. 62 (Pl.'s Controverting Statement of Facts) ¶ 1.) The security guard explained to Defendant that Plaintiff had bought a round of shots for several women in the bar and that one of the women accused him of slipping something into her drink. (Doc. 53 ¶ 2.) Plaintiff adds that both he and his cousin bought the shots. (Doc. 62 ¶ 2.) Plaintiff and his companions admitted to officers to buying shots for the women but denied putting anything in the women's drinks. (Doc. 53 ¶ 3.) Plaintiff told Defendant and other Scottsdale Police Department ("SPD") officers on the scene that he was a military veteran. (*Id.* ¶ 4.)

SPD Officer Amber Valentine interviewed one of the complaining women, who explained that Plaintiff was standing at the bar trying to "talk her up" and offered to buy her a shot. (*Id.* ¶¶ 5, 6.) Plaintiff objects to this statement to the extent the woman did not

identify whether she was referring to Plaintiff or one of Plaintiff's cousins. (Doc. 62 ¶ 6.) The woman reported that Plaintiff acted suspiciously after the bartender delivered the two shots, putting his hands over both shots and touching the shots in a manner she described as acting "weird." (Doc. 53 ¶ 7.) She explained that she did not feel comfortable with Plaintiff after this interaction and that other female bar patrons had come forward after her to share concerns. (*Id.* ¶ 10.) She said she felt she had to report the incident but did not wish to be involved in a prosecution and merely wanted to be sure that Plaintiff and his companions were excluded from the bar. (*Id.* ¶¶ 11, 12.)

Defendant told Plaintiff that he located no evidence to support the claim that Plaintiff and his companions had put anything in the women's drinks and the reporting witness did not want to pursue a prosecution. (*Id.* ¶ 13.) Defendant explained that Casa Amigos staff just needed Plaintiff and his companions to settle their open bar tab and leave the premises. (*Id.* ¶ 14.) Defendant emphasized several times that they were not in any trouble and that they would be free to go after they paid their tab. (*Id.* ¶ 15.)

The parties dispute whether Plaintiff was highly intoxicated and whether he became increasingly agitated and aggressive with Defendant over the course of several minutes, demanding that Defendant review security footage and investigate the complaining bar patron for making a false allegation. (*Id.* ¶ 16; Doc. 62 ¶ 16.) Plaintiff states that he was confused and worried because of the accusations made against him and was critical of Defendant for not securing the video surveillance that would exonerate him, and he "was looking for answers in a questioning tone." (Doc. 62 ¶ 16.)

At the conclusion of the investigation, officers repeatedly told Plaintiff to move on after signing the bar tab, that he was not in trouble, and to not let this ruin his bachelor party or visit to Arizona. (Doc. 53 ¶ 19.) Defendant told Plaintiff to "go home, please" to "please leave" and that he was no longer welcome at Casa Amigos and "needed to leave." (*Id.* ¶ 20.) Officer Valentine implored Plaintiff to sign his bar bill so "you can go home and then we're done with you." (*Id.* ¶ 21.) Defendant asserts that Plaintiff responded by asking "or what?," to which Defendant responded, "then you go with me," indicating that

Plaintiff would be arrested if he would not leave the premises.[1] (*Id.* ¶ 22.) After he signed his bar tab, Plaintiff's companion implored him to leave. (*Id.* ¶ 23.)

Defendant remained in front of Casa Amigos, and he asserts that Plaintiff and his companions "continued fighting, yelling and pushing each other on the sidewalk, knocking down a passerby who attempted to intervene and disrupting other people as they tried to walk by on the sidewalk." (*Id.* ¶ 24.) Plaintiff disputes that a passerby was knocked to the ground or tried to intervene, that other people were disrupted, or that he and his cousins were fighting. (Doc. 62 ¶ 24.) Officer Joseph Vazquez advised Plaintiff, "you need to get an Uber and go home alright," and Plaintiff responded defiantly, "nah, nah, nah, nah, nah, that's not happening tonight." (Doc. 53 ¶¶ 25, 26.)

Defendant moved away from Plaintiff and his group, returning to stand at the entrance to Casa Amigos, and Plaintiff continued reapproaching Defendant, ignoring no fewer than 13 orders to leave and/or go home. (*Id.* ¶¶ 27, 28.) Defendant asserts, and Plaintiff disputes, that Plaintiff became increasingly agitated, erratic and aggressive, yelling at Defendant and waving his hands aggressively within inches of Defendant's face. (*Id.*¶ 30; Doc. 62 ¶ 30.) Plaintiff asserts that he was confused and worried because of the accusations made against him and he was looking for answers in a questioning tone. (Doc. 62 ¶ 30.) Plaintiff also denies waving his hands aggressively at Defendant or in a threatening manner, and asserts he raised his hands in a questioning manner, while holding his wallet and credit card. (*Id.*)

---

[1] Plaintiff disputes this statement, asserting that it is directly contradicted by the audio/video evidence in the record, but he does not explain what exactly in Defendant's paragraph 22 is contradicted by the audio/video evidence. (Doc. 62 ¶ 22.) Defendant cites to his Incident/Investigation Report in support of paragraph 22, and the Incident/Investigation Report does include the exchange of words as Defendant wrote in paragraph 22. (*See* Doc. 53-1 at 8.) In support of his dispute, Plaintiff cites ten seconds of one of the ten separate video segments submitted by Defendant. (Doc. 62 ¶ 22, citing Def. Ex. 6, Vattuone 2 OBC at 01:10:39—01:11:35.) Those ten seconds do not contain the exchange of words as asserted by Defendant, but the entire encounter between Plaintiff and SPD officers was over 20 minutes long and it is possible the exchange occurred at another time during their encounter.

Defendant asserts that over the course of this interaction with SPD, Plaintiff was given at least 7 lawful commands to put his hands down and/or to not touch officers and was advised repeatedly that he would go to jail or be arrested if he continued to not comply. (Doc. 53 ¶ 31.) Plaintiff objects, asserting the evidence does not support he ever touched an officer or that the evidence cited encompasses "this interaction." (Doc. 62 ¶ 31.) Defendant commanded Plaintiff "put your hands down" and warned him to "please leave" or he would be arrested for failure to obey a police officer and go to jail. (Doc. 53 ¶ 32.)

Defendant asserts that Plaintiff continued yelling and became more erratic, aggressively and swiftly raising his hands close to Defendant's face. (*Id.* ¶ 33.) Plaintiff disputes this, asserting again that he was confused and worried because of the accusations made against him, that he only raised his hands in a questioning manner, while holding his wallet and credit card. (Doc. 62 ¶ 33.) Defendant asserts that he noted Plaintiff's increasing display of aggression and that his hands were within striking distance of Defendant's face and dangerously close to his taser, trauma shears, and folding knife kept accessibly on the front of Defendant's vest. (Doc. 53 ¶ 34.) Plaintiff disputes this statement, asserting again that he was confused and worried because of the accusations made against him, that he only raised his hands in a questioning manner while holding his wallet and credit card, and he disputes that his hands were "dangerously close" to Defendant's weapons, noting that Defendant testified he did not believe Plaintiff was going to be able to take any of his weapons from him. (Doc. 62 ¶ 34.) Defendant asserts he had been struck in the face in the line of duty before and recognized a threat to his safety with Plaintiff not obeying orders and thrusting his hands within striking distance of his face. (Doc. 53 ¶ 35.) Plaintiff disputes that he thrust his hands toward Defendant. (Doc. 62 ¶ 35.)

Defendant finally took hold of Plaintiff's hands, which were within inches of Defendant's face, and arrested Plaintiff for failure to obey a police officer. (Doc. 53 ¶ 36.) Defendant asserts that Plaintiff broke Defendant's hold on his wrists by resisting, tensing his muscles, interlocking his fingers in a closed fist and pushing back against Defendant. (*Id.* ¶ 37.) Plaintiff disputes this is what happened, asserting that Defendant intentionally

released his hold on Plaintiff so he could deliver a knee strike. (Doc. 62 ¶ 37.) Defendant asserts, and Plaintiff disputes, that Defendant tried to pull Plaintiff's arms to his back for handcuffing, but he was unable to pull apart Plaintiff's tensed up fists. (Doc. 53 ¶ 38; Doc. 62 ¶ 38.) Plaintiff asserts that his hands were never together, and Defendant did not attempt to handcuff him before throwing him to the ground. (Doc. 62 ¶ 38.) Defendant delivered a knee strike to Plaintiff's left hip area, just below his belt and above his thigh, and this succeeded in separating Plaintiff's hands apart. (Doc. 53 ¶¶ 39, 40.) Plaintiff disputes that his hands were together. (Doc. 62 ¶ 40.)

Defendant asserts that he attempted to move Plaintiff to a nearby chain-link fence to facilitate control and handcuff him on his feet without having to go to the ground, but Plaintiff continued resisting arrest by pushing off the fence, twisting and pulling away from Defendant. (Doc. 53 ¶¶ 41, 42.) Plaintiff disputes that Defendant ever attempted to handcuff him before throwing him to the ground, and Plaintiff asserts that he was not resisting arrest, twisting or pulling away and that Defendant had full control of Plaintiff's movement, spun Plaintiff around, put his arm around Plaintiff's neck, slammed him against the fence, and threw him to the ground. (Doc. 62 ¶¶ 41, 42.) Defendant asserts that he followed his training in response to active resistance and guided Plaintiff to the ground, but Plaintiff asserts he was not engaged in active resistance, he was charged with passive resistance even though he was not resisting at all, and that Defendant threw him to the ground face first, which broke Plaintiff's nose. (Doc. 53 ¶ 43; Doc. 62 ¶ 43.)

Defendant asserts that once Plaintiff was on the ground, Plaintiff pulled his right hand under his stomach, but Plaintiff responds that he landed on his right hand with Defendant on top of him and Defendant's weight prevented Plaintiff from giving up his right hand until Defendant shifted his weight.[2] (Doc. 53 ¶ 44; Doc. 62 ¶ 44.) Defendant asserts that Plaintiff's active resistance continued as he disobeyed several lawful commands to "give me your hand" and continued to twist, pull away and tense up as

---

[2] Plaintiff asserts that Defendant was 6'4" and weighed 215 pounds with his tactical gear on, whereas Plaintiff was 5'6" and weighed 160 pounds. (Doc. 62 ¶ 69.)

Defendant attempted three brachial stuns (an open-handed pain compliance technique) to gain control over Plaintiff and obtain compliance with orders to surrender his hands. (Doc. 53 ¶ 45.) Plaintiff disputes that he was actively resisting, asserting that Defendant had control of Plaintiff's left hand when they went to the ground, that Plaintiff landed on his own right hand with Defendant on top of him, that Defendant straddled Plaintiff's midsection and delivered a closed fist strike to Plaintiff's head while Officer Valentine grabbed both of Plaintiff's legs. (Doc. 62 ¶ 45.) Plaintiff asserts that Officer Leyba grabbed the back of Plaintiff's head, and when Officer Leyba let go, Defendant delivered three brachial stuns and a knee strike. (*Id.*) Once Defendant shifted his weight, Plaintiff voluntarily placed his right hand on the back of his head and yelled, "I'm giving you my hand," which Officer Leyba seized and took control of. (*Id.*) Plaintiff asserts that Defendant then placed Plaintiff's left hand on the back of his head and with Plaintiff's hands secured to the back of his head, Defendant tased Plaintiff in drive stun mode. (*Id.*)

Defendant contends that even after the brachial stuns, Plaintiff did not comply, but Plaintiff disputes this fact, asserting that at no time was he noncompliant. (Doc. 53 ¶ 46; Doc. 62 ¶ 46.) Plaintiff contends that Defendant immediately had control of his left hand when they went to the ground, he was prevented by Defendant's weight from immediately giving up his right hand, and gave up his right hand once Defendant shifted his weight. (Doc. 62 ¶ 46.)

Defendant asserts that after he warned Plaintiff he would be tased if he continued resisting, he delivered a single five (5) second taser drive stun which finally resulted in Plaintiff's compliance. (Doc. 53 ¶ 47.) Plaintiff does not dispute that he was tased, but he does dispute that he was resisting or failed to comply, asserting that he was face down with his hands on his head and Defendant had control of his left hand and Officer Leyba had control of Plaintiff's right hand when he was tased. (Doc. 62 ¶ 47.)

Plaintiff was arrested and charged with Failure to Obey a Police Officer (SRC § 19-13), Disorderly Conduct Fighting (A.R.S. § 13-2904(A)(1)), Disorderly Conduct Disruptive Behavior (A.R.S. § 13-2904(A)(1)) and Resisting Arrest (A.R.S. § 13-

2508(A)(3). (Doc. 53 ¶ 51.) Plaintiff clarifies that he was arrested for resisting arrest for engaging in "passive resistance." (Doc. 62 ¶ 49.) Plaintiff was transported to the hospital for assessment and eventually booked into jail. (Doc. 53 ¶ 50.) Defendant asserts that he used his discretion to give Plaintiff a break while on his bachelor party trip with friends, electing to not charge him with active resistance to "keep it as a misdemeanor versus him getting a felony . . . ." (*Id.* ¶ 67.) Plaintiff disputes this statement to the extent it implies he engaged in active resistance. (Doc. 63 ¶ 67.)

Plaintiff retained counsel for his underlying criminal case in Scottsdale City Court and learned early in his criminal case that there was a Veteran's Court program available to him and he requested that his case be transferred there. (*Id.* ¶¶ 53, 54, 57.) Plaintiff's participation in the Veteran's Court program involved completion of several Court directives and required tasks, including anger management and substance abuse counseling and writing an apology letter to Defendant. (*Id.* ¶ 59.)

In his letter to Defendant, Plaintiff wrote

> I sincerely apologize for the way I acted on the night of September 21st. After reviewing the body cam footage, I felt sick to my stomach, I can't believe I was addressing the very individuals who risk their lives to keep civilians like myself safe in such a disgusting manner. I am a law-abiding citizen and a veteran I apologize for myself my race my age group and most importantly on behalf of all the veterans out there.
>
> No-one should ever be spoken to like the way I spoke to you Officer Vattuone, I commend you on the way you handled the situation. You were an extreme professional who showed an immense amount of patience, the ball was in my court, and I unfortunately did not play it right. I was given many outs by you, but I kept the full court press and this was a humbling experience that I've definitely learned from.

(*Id.* ¶ 61.) Plaintiff testified that he wrote this letter himself without any assistance. (*Id.* ¶ 62.) Plaintiff separately left a voicemail Defendant in June 2022 (before completion of the Veteran's Court program) during which he stated in relevant part, ". . . reviewing some footage and yeah uh was not a good human being that night. So just wanted to call let you

know, you know thank you for your service you did a fantastic job honestly uh, if I was in your position I may not have handled it as well as you did. . . ." (*Id.* ¶ 63.)

Upon completion of the requirements of the Veteran's Court program, including all required counseling and the apology letter, Plaintiff's criminal case was dismissed at the request of the Scottsdale City Attorney's Office. (*Id.* ¶ 64.) Plaintiff testified that on completion of the Veteran's Court program he received the benefit of having his charges dismissed. (*Id.* ¶ 65.)

The Veteran's Court and Scottsdale City Court accepted Plaintiff's position in his criminal case, expressing complete accountability, commending Defendant for the way he handled the situation, thanking him for his service and describing Defendant as "an extreme professional" during this incident and asserting that he "did a fantastic job honestly." (*Id.* ¶ 66.)

In his Statement of Additional Facts, Plaintiff asserts that when he wrote the apology letter and left the voicemail for Defendant, he had not reviewed or reviewed carefully the portion of the body worn camera (BWC) footage depicting Defendant's use of force. (Doc. 62 ¶ 80.) Plaintiff asserts that a complete and closer review of the video footage is what prompted him to file this civil lawsuit. (*Id*.) Defendant had five assisting officers during his use of force against Plaintiff and did not believe Plaintiff was armed. (*Id.* ¶¶ 70-71.)

**Video Evidence**

Defendant has submitted video from his BWC and from Officers Valentine, Leyba, and Vazquez. The Court has reviewed all the BWC videos submitted and summarizes the most relevant portions here.

**Defendant's BWC**

The first video segment begins on September 22, 2021, at 12:53 a.m., and Defendant speaks to Plaintiff and his cousin, who both consent to body searches. (Def.'s Ex. 3 (segment titled "Vattuone 1 arrival") at 00:53:57—00:57:48.) Plaintiff tells Defendant that the accusation made against them could ruin their lives and he wants to press charges; the cousin explains what happened during their interaction with the women in the bar, and the

cousin says security video in the bar will confirm their version. (*Id.* at 00:57:50—01:01:44.)

The next video segment begins at 1:04 a.m.; Plaintiff is visibly upset that he has been accused and asks Defendant "to get the fuckin footage." (*Id.* Def.'s Ex. 3 (segment titled "Vattuone 2 interaction") at 01:05:30—01:05:45.) Defendant asks Plaintiff if he will let him do his job, and Plaintiff responds, "I am doing your job for you, bro, get the fucking footage." (*Id.* at 01:05:48—01:05:56.) Defendant says, "don't raise your voice at me," and Plaintiff yells, "or what? cause I'm not under fucking arrest," and Defendant agrees Plaintiff is not under arrest, and Plaintiff yells, "so get the fucking footage." (*Id.* at 01:05:57—01:06:01.) Defendant says loudly, "shut your fucking mouth!" and Plaintiff, who is very close to the camera, says, "or what?" as his cousin comes up from behind and touches Plaintiff on the shoulder and tries to calm Plaintiff down. (*Id.* at 01:06:02–01:06:10.) Plaintiff is talking over Defendant as Defendant says "I'm trying to clear your name and get you out of here. You're acting like a little bitch right now! [unintelligible] I'm trying to get your fuckin tab so you guys can go." (*Id.* at 01:06:06—01:06:15.) Plaintiff continues to gesture with his hands, which are right in front of the BWC, and talks over Defendant, who says "get your hands down or you're gonna hit the ground." (*Id.* at 01:06:16—01:06:18.)

Plaintiff calms himself momentarily and continues explaining he does not want to be arrested later for the bar incident, and Defendant assures Plaintiff, "you're not going to. Grow up!" (*Id.* at 01:06:30—01:07:04). Defendant tells Plaintiff to just sign his bar tab and go home as Plaintiff continues to ask what will happen to the people who falsely accused him, and he tells Defendant to get the footage. (*Id.* at 01:07:10—01:07:35.) Defendant tells Plaintiff to put his hand down and sign his tab and Plaintiff continues asking about the people who accused them of wrongdoing. (*Id.* at 01:07:38—01:08:40.) Plaintiff then walks away from Defendant and starts talking to two other officers and saying he was never a threat. (*Id.* at 01:08:40—01:09:22.) Defendant walks up to Plaintiff and again asks him to sign the tab so Defendant can go and do his job. (*Id.* at 01:09:20—01:09:23.)

Plaintiff says, “wait, wait, just back off” as his hand reaches forward and apparently touches Defendant, who bats it away and says, “put your hand down. You can go to jail. Sign your tab and get the fuck out of here. Right now.” (*Id.* at 01:09:24—01:09:31.) Plaintiff continues to talk saying he’s going to sign his tab, and after a minute appears to sign his bar tab, and an officer tells him not to forget to take his card and they can all go. (*Id.* at 01:09:32—01:11:00.)

Defendant’s third video segment picks up at 1:17 a.m. and Plaintiff is initially two or three feet away from Defendant and talking. (Def.’s Ex. 3 (segment titled “Vattuone 3”) at 01:17:20—01:17:30.) Plaintiff says, “this is not done,” and Defendant responds, “this is your bachelor party, correct? So, go home, and don’t ruin your trip out to Arizona like this. Very simple. Go home, please, or we’ll put you in time out.” (*Id.* at 01:17:30—01:17:43.) Plaintiff continues to gesticulate with his hands in the air and says he has been kicked out of the club and this is a crime scene, and he asks the officers to watch his stuff. (*Id.* at 01:17:45—01:17:50.) Defendant says, no, “we’re not your babysitters, you’re a grown ass man,” and Plaintiff responds, “you’re acting like my babysitter, though.” (*Id.* at 01:17:52—01:18:00.) Plaintiff talks more about not doing anything wrong and Defendant says, “I’m giving you a lawful warning to leave here. Go home.” (*Id.* at 01:18:02—01:18:13.) Plaintiff keeps talking about the incident and Defendant says slowly, “you are not in trouble. Leave. But you’re going to be in trouble for failure to obey a police officer.” (*Id.* at 01:18:14—01:18:31.)

Plaintiff continues talking, asking questions about the role of the bar’s security, and Defendant says they are doing their job, and Plaintiff gestures with his hands toward Defendant and says, “I’m not trying to be a dick, you are, right?” (*Id.* at 01:18:40—01:19:05.) Defendant says, “no, I’m not,” and Plaintiff yells, while gesturing with his hands, “Bro, the way you’re sounding—that’s not your actual fucking voice!” (*Id.* at 01:19:05—01:19:08.) At this point, Defendant commands, “put your hands down” and appears to slap down or grab Plaintiff’s left hand but there is not a clear view of this. (*Id.* at 01:19:10.) Plaintiff is right in front of the camera, so only his neck and torso are visible,

and it appears he moves back and pulls his hand or arm away from Defendant's grasp. (*Id.* at 01:19:12.) The view in the video becomes blurred at this point, apparently because Defendant has grabbed Plaintiff, they are scuffling, and Plaintiff's body is next to the camera and blocking the view. (*Id.* at 01:19:13—01:19:18.) A better view of these final moments and Defendant's arrest of Plaintiff is seen from Officer Leyba's BWC.

**Officer Leyba BWC**

From this video, in the seconds before Defendant grabs Plaintiff, Plaintiff is seen standing just inches from Defendant, gesturing with his hands, and talking loudly about his stuff and the officers acting like babysitters, and Defendant warns Plaintiff he is going to be in trouble for failing to obey a police officer. (Def.'s Ex. 3 (segment titled "Leyba 2 altercation") at 01:17:46—01:18:33.) Plaintiff continues talking and sounding angrier while waving his hands near Defendant's face and pointing and Defendant eventually orders Plaintiff to "put your hands away, put your hands down!" (*Id.* at 01:18:32—01:19:12.) While commanding Plaintiff to put his hands down, Defendant pushes down on Plaintiff's hands and moves him backwards a few feet before raising his knee toward Plaintiff's midsection, turning Plaintiff around, putting his arm around Plaintiff's neck, and pushing him against a fence. (*Id.* at 01:19:11—01:19:14.) Defendant and Plaintiff are against the fence for only a moment before Defendant pulls Plaintiff off the fence and takes Plaintiff to the ground as another officer appears on camera to assist and holds down Plaintiff's legs. (*Id.* at 01:19:14—01:19:20.) Events are happening quickly, and it is not possible to clearly see what happened while Plaintiff was against the fence or if Plaintiff was resisting at all before Defendant took him to the ground. Approximately five seconds elapsed between the time Defendant initially grabbed Plaintiff's hands and pulled him to the ground, and no commands are heard from Defendant until Plaintiff has been on the ground for several seconds.

Defendant is seen straddling or sitting on Plaintiff's midsection, and Plaintiff appears to be laying mostly on his right side with Defendant atop him. (*Id.* at 01:19:22—01:19:24.) Defendant orders Plaintiff, "Give me your hand! Now! Give me your hand!

I'm going to tase you into next fucking week! Give me your hand!" (*Id.* at 01:19:23—01:19:31.) At this point, Plaintiff's right hand appears to be pinned under Plaintiff's right side or chest and his left hand may be on his back already, although the glimpse of the left hand is fleeting. (*Id.* at 01:19:23—01:19:35.) It sounds like Plaintiff says, "I'm giving you my hand, bro," but the audio is muffled. (*Id.* at 01:19:36—01:19:37.) Plaintiff's right hand then comes out from under him, and Plaintiff says, "I got it, I got it." (*Id.* at 01:19:40—01:19:46.) An officer's hand is seen holding Plaintiff's right wrist at the back of Plaintiff's head and it appears that an officer is also holding Plaintiff's left wrist on his neck. (*Id.* at 01:19:46—01:19:47.) Even so, Defendant continues to yell, "give me your hand. Give me your fucking hand." (*Id.* at 01:19:46—01:19:51.) Plaintiff again says, "I got it. I got it, I got it, I got it," before a Taser followed by Plaintiff's screams are heard. (*Id.* at 01:19:54—01:19:59.) Defendant again says, "Give me your hand," and an officer's hand directs Plaintiff's right hand from the back of Plaintiff head to the middle of his back. (*Id.* at 01:20:00—01:20:05.) Three officers are seen above Plaintiff, and it appears three officers are on the ground handcuffing Plaintiff, but Plaintiff is not on screen at this point. (*Id.* at 01:20:05—01:20:20.)

## IV. Discussion

### A. Judicial Estoppel

Defendant argues that Plaintiff is judicially estopped from taking clearly inconsistent positions in the two proceedings—his underlying criminal court case and this action. (Doc. 57 at 19.)

Under the equitable doctrine of judicial estoppel, a party may not gain an advantage by taking one position and then, in the same or different action, taking an inconsistent position to seek a second advantage. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (citation omitted). The Supreme Court has listed three factors that a court "may" consider when determining whether to apply the doctrine of judicial estoppel: (1) whether a party's later position is "clearly inconsistent" with its earlier position; (2) whether the court accepted the party's earlier position, so that judicial

acceptance of an inconsistent position in a later proceeding would create the perception that the court was misled; and (3) whether the party asserting an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 782-83 (citing *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (internal citations omitted)). These three factors are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," and additional factors may be considered in specific factual contexts. *New Hampshire*, 532 U.S. at 751. For example, a court may also examine "whether the party to be estopped acted inadvertently or with any degree of intent." *EaglePicher Inc. v. Fed. Ins. Co.*, No. CV 04-0870-PHX-MHM, 2007 WL 2265659, at *3 (D. Ariz. Aug. 6, 2007) (citing *Johnson v. Or. Dep't of Human Res. Rehab. Div.*, 141 F.3d 1361, 1369 (9th Cir. 1998)).

Judicial estoppel applies in a subsequent litigation if the court in the prior litigation or proceeding adopted or accepted the inconsistent assertion. *See, e.g.*, *Rissetto v. Plumbers & Steamfitters Loc. 343*, 94 F.3d 597, 606 (9th Cir. 1996) (holding that "having obtained a favorable settlement based on her assertion that she could not work, plaintiff was estopped from claiming that she was performing her job adequately" in order maintain her claim of age discrimination); *Masayesva v. Hale*, 118 F.3d 1371, 1382 (9th Cir. 1997) (noting that the Ninth Circuit had recently adopted the ruling of a majority of courts by "apply[ing] judicial estoppel only if the court has relied on the party's previously inconsistent statement").

Defendant argues that in his criminal case, Plaintiff, after watching the BWC footage, submitted an apology letter to Defendant in which he commended Defendant "on the way you handled the situation. You were an extreme professional who showed an immense amount of patience . . . ." (Doc. 57 at 20.) Defendant asserts that Plaintiff also left a similar voice message stating "thank you for your service you did a fantastic job honestly uh if I was in your position I may not have handled it as well as you did . . . ." (*Id.*) Defendant argues that Plaintiff's position in this case is inconsistent because in his criminal case, Plaintiff commended Defendant for doing a "fantastic job" and now he

claims Defendant used excessive force and retaliated against him for exercising his First Amendment rights. (*Id.*) Defendant contends that Plaintiff obtained the benefit he desired by submitting the apology letter in Veteran's Court and having his criminal charges dismissed, and Plaintiff would derive an unfair advantage and financial windfall if permitted to take an inconsistent position in this case. (*Id.* at 21.)

Plaintiff responds there is no authority to support that because an individual makes an apology to the arresting officer during a criminal proceeding that person is precluded from bringing a civil action arising out of the officer's use of force during the arrest. (Doc. 61 at 17.) Plaintiff argues even if there were such authority, his position in this case is not clearly inconsistent with his earlier position. (*Id.*) Plaintiff asserts that, as he explained at his deposition, he had not reviewed, or reviewed closely, all the BWC footage when he apologized to Defendant, and that more careful review of Defendant's use of force is what prompted him to file a civil action. (*Id.*) Plaintiff asserts that he explained at his deposition that while he was sorry for the way he acted, it did not justify the amount of force used against him. (*Id.*)

Defendant replies that Plaintiff's apology is not the inconsistent position complained of here, but rather Plaintiff taking inconsistent positions about Defendant's conduct during the arrest and benefitting from those inconsistent positions in two different legal proceedings. (Doc. 64 at 4-5.) Defendant argues that Plaintiff cannot take the position in Veteran's Court that Defendant was "an extreme professional" and commending him on how he handled the arrest, and then take the position in this Court that Defendant was driven by an evil motive, that he attacked Plaintiff, used excessive force, and violated Plaintiff's First and Fourth Amendment constitutional rights. (*Id.* at 5.)

Based on the record evidence, the Court cannot say that Plaintiff has taken clearly inconsistent positions in the two proceedings. The criminal proceeding in Veteran's Court was about Plaintiff's conduct the night of the incident, not Defendant's conduct. The gravamen of Plaintiff's letter and voicemail appears to be about the way he (Plaintiff) acted that night before Defendant grabbed Plaintiff to arrest him. Plaintiff's comments do not

appear to be exonerating Defendant from the alleged unlawful use of excessive force or alleged curtailment of his First Amendment rights. Nor is there evidence before the Court that the Veteran's Court relied on Plaintiff's statement that Defendant was "an extreme professional" and did a "fantastic job" in deciding whether to accept dismissal of the criminal charges as opposed to Plaintiff's acceptance of responsibility for his own actions. *See Morris v. California*, 966 F.2d 448, 453 (9th Cir. 1991) (recognizing that in most circuits, judicial estoppel is "inapplicable unless the inconsistent statement was actually adopted by the court in the earlier litigation"). And it does not appear that Plaintiff would derive an unfair advantage if he succeeds in this action by holding Defendant accountable for Defendant's alleged conduct during the arrest, particularly since all but the passive resisting arrest charge appear predicated on events that preceded Defendant's use of force.

Accordingly, the Court will deny Defendant's request for summary judgment based on judicial estoppel.

**B. Fourth Amendment (Excessive Force)**

Plaintiff alleges in his First Claim for Relief that Defendant seized him by the wrists, delivered a knee strike to his body, drove him backwards toward a chain link fence, spun him around and placed an arm around his neck, pushed him face first into the fence, slammed him to the ground, delivered knee and fist strikes to his body and head and tased him. (Doc. 1 ¶ 18.) Plaintiff alleges that when Defendant decided to go hands-on with Plaintiff, and throughout the various uses of force against him, Plaintiff was not actively resisting or attempting to evade arrest, posed no immediate threat to the safety of the officers or to others, and was suspected of minor, if any, criminal activity. (*Id.* ¶ 20.) Plaintiff alleges that Defendant was assisted by five to seven other officers, had already searched Plaintiff's person, had time to deliberate and determine the amount and type of force to use, and had available alternative methods to take Plaintiff into custody, such as turning him around and handcuffing him while utilizing, if necessary, the assistance of the other officers. (*Id.*)

. . . .

### 1. Legal Standard

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.*

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396-97; *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "These factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (citations omitted). "Other relevant factors include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033-34 (9th Cir. 2018); *see Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (considering officer's failure to warn plaintiff that he would be shot if he did not comply with the officer's orders and what other tactics, if any,

were available to effect the arrest in determining whether force used was reasonable); *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001). "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott*, 550 U.S. at 381 n.8. But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

**2. Analysis**

**a. Nature of the Force Inflicted**

Defendant separates his uses of force on Plaintiff into three phases and argues that the force used at each stage was objectively reasonable. (Doc. 57 at 11.) Defendant asserts that the separate phases occurred when Defendant (1) initially took hold of Plaintiff's wrist to arrest and handcuff him; (2) attempted to handcuff Plaintiff while they were still standing and then moved him to the fence and finally to the ground; and (3) used the brachial stun compliance technique and the Taser. (*Id*. at 11-15.)

In his Response, Plaintiff does not address the first phase—Defendant's grabbing of Plaintiff's hands, and therefore concedes the argument that this first use of force was

reasonable. That is because the failure of a represented party to respond to an issue can be deemed a concession to the opposing party's argument resulting in waiver of the issue. *See, e.g., Doe v. Dickenson*, No. CV-07-1998-PHX-GMS, 2008 WL 4933964, at *5 (D. Ariz. 2008) ("[t]he Court is entitled to treat Plaintiffs' failure to respond as waiver of the issue and consent to Defendants' argument"); *Currie v. Maricopa Cnty. Cmty. Coll. Dist.*, No. CV-07-2093-PHX-FJM, 2008 WL 2512841, at *2 n.1 (D. Ariz. 2008) ("Plaintiff does not respond to this argument, and her failure to do so serves as an independent basis upon which to grant [the] motion"); LRCiv 7.2(i) (if "the unrepresented party or counsel does not serve and file the required answering memoranda, . . . such non-compliance may be deemed a consent to the denial or granting of the motion and the Court may dispose of the motion summarily"). Because Plaintiff concedes the first use of force—Defendant grabbing his hands—was reasonable, the Court will only analyze whether the second and third uses of force were reasonable.

Defendant does not actually characterize the nature of the force used during the second and third phases. As to the knee strike and pushing Plaintiff to the fence during the second phase, Defendant merely argues that "Officers are entitled to use escalating force of this nature to detain an arrestee and protect themselves where the arrestee is actively resisting the officer's efforts to do so." (Do. 57 at 13.) Defendant also does not address taking Plaintiff to the ground except to say he "guided [Plaintiff] to the ground to gain control and complete handcuffing." (*Id.*) Regarding this second phase, Plaintiff does not specifically address the knee strike and push to the fence but asserts that Defendant "performed a vicious takedown of [Plaintiff], slamming him face first into the sidewalk, breaking his nose." (Doc. 61 at 6.) Plaintiff argues this use of force was a severe and substantial intrusion on his Fourth Amendment rights. (Doc. 61 at 6.)

Although it is the amount of force, not the amount of injury, that matters in the use-of-force context, courts may consider "the severity of injuries in evaluating the amount of force used." *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018.) Contrary to Defendant's description of simply "guid[ing]" Plaintiff to the ground, the video evidence

shows that after the knee strike, Defendant quickly put his arm around Plaintiff's neck, pushed him against the fence, and then forcefully threw him to the ground, resulting in a broken nose. Courts have equated this type of force with intermediate force. *Cf. Carr v. County of San Diego*, No. 19-CV-1139 JLS (MDD), 2021 WL 4244596, at *13 (S.D. Cal. Sept. 17, 2021) ("putting Plaintiff into a headlock, slamming him to the ground, and then having multiple officers put their bodyweight on him would appear to be at least an intermediate use of force"); *see Sheridan v. Trickey*, No. CIV. 10-06034-AC, 2010 WL 5812678, at *5 (D. Or. Dec. 16, 2010), *report and recommendation adopted*, No. CV 10-6034-AC, 2011 WL 588769 (D. Or. Feb. 10, 2011) (slamming subject's head against the asphalt with sufficient force to knock him unconscious and fracture his face is at least intermediate force).

As to the third phase when Plaintiff was on the ground, Defendant argues the use of the brachial stun compliance technique and taser was objectively reasonable, but again does not actually characterize the nature of those types of force. (*See* Doc. 57 at 14.) Plaintiff does not address the brachial stun technique but asserts that the use of a taser in drive-stun mode was a "relatively significant use of force." (*Id*. at 11, citing *Bryan*, 630 F.3d at 826.)

A taser in dart mode "constitute[s] an intermediate, significant level of force" by delivering "a 1200 volt, low ampere electrical charge" that "instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body and leaving the target limp and helpless." *Mattos*, 661 F.3d at 443 (internal citation and quotation omitted). When a taser is in drive-stun mode, "the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode." *Id*. The Ninth Circuit in *Mattos* did not determine the level of force when a taser is used in drive-stun mode but found that such a determination was unnecessary to assess the reasonableness of the tasing. *Id*. District courts in the Ninth Circuit have "assume[d] that the taser use in drive stun

mode constituted a somewhat less than intermediate level of force." *Lerma v. City of Nogales*, No. CV 12-518-TUC-FRZ, 2014 WL 4954421, at *8 (D. Ariz. Sept. 30, 2014) (citing cases).

Plaintiff does not claim any lasting injuries resulted from either the brachial stun technique or the tasing. Those uses of force, then, constituted somewhat less than intermediate level of force.

Whether the above moderate to intermediate levels of force were reasonable depends on the government interests at stake, which requires analyzing the severity of Plaintiff's crime, the threat posed by Plaintiff, and whether Plaintiff was resisting or evading arrest. *Espinosa*, 598 F.3d at 537; *Graham*, 490 U.S. at 396-97.

**b. Government Interests (*Graham* factors)**

**i. Severity of the Crime**

Defendant argues that after officers concluded their investigation into the complaint at the bar, Plaintiff "escalated the closed investigation into serious crimes and threats to law enforcement outside the bar." (Doc. 57 at 15.) Defendant argues that Plaintiff's "subsequent disorderly conduct, fighting and refusing to obey police commands led to his arrest and then actively resisting arrest." (*Id*. at 16.)

Plaintiff responds that he was arrested for passive, not active resistance, and that a reasonable jury could conclude from the video evidence that Plaintiff engaged in no resistance at all when Defendant "went hands on, brought [Plaintiff's] hands down to his side, voluntarily released [Plaintiff's] hands, [] delivered a knee strike . . . spun [Plaintiff] around, put his arm around [Plaintiff's] neck, slammed him against the fence, and threw him to the ground." (Doc. 61 at 7.) Plaintiff asserts that he was cited for misdemeanor criminal activity of failure to obey a police officer, disorderly conduct fighting, disorderly conduct disruptive behavior, and resisting arrest (passive resistance).

Defendant does not explain what he means by "serious crimes" or cite to evidence to support that the crimes Plaintiff was charged with were serious or even felonies. The evidence reflects that all charges were dismissed at the request of the Scottsdale City

Attorney's Office once Plaintiff completed the requirements of the Veteran's Court program. While the crimes Plaintiff was charged with do not appear to be severe, Plaintiff does not challenge the appropriateness of the charges. Based on this record, there is a question of fact whether Defendant reasonably believed Plaintiff was engaged in serious criminal activity.

**ii. Threat to Officers and Others**

The "most important *Graham* factor" is whether the suspect "posed an immediate threat to the safety of the officers or others." *Mattos*, 661 F.3d at 441. But "[a] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle,* 272 F.3d at 1281.

Defendant argues that Plaintiff's "erratic and increasingly aggressive behavior, refusal to maintain physical distance from the officer, and active resistance and fighting" would lead an objectively reasonable officer to fear for his safety until Plaintiff was restrained and compliant. (Doc. 57 at 16.) Defendant argues that he used minimal force and only escalated the level of force when Plaintiff's aggression and active resistance continued, and the less intrusive efforts failed. (*Id.*)

Plaintiff responds that he had not been fighting with his companions and was not actively resisting arrest, that Defendant never commanded Plaintiff to move back, and Defendant did not himself move back, that Plaintiff was not waving his hands aggressively at Defendant or in a threatening manner, and Plaintiff did not swing at or push Defendant or take a fighting stance. (Doc. 61 at 8.) Plaintiff argues that Defendant had already searched him, did not believe Plaintiff was armed, and did not believe Plaintiff was going to be able to take any of Defendant's weapons from him. (*Id.*) Plaintiff further argues that by the time Defendant slammed him to the pavement, Defendant was and had been in full control of Plaintiff and any threat reasonably perceived had abated. (*Id.*) Plaintiff argues that by the time Defendant struck and tased him, he was face down on the pavement surrounded by six officers, that Defendant had Plaintiff's left hand pinned to the back of

Plaintiff's head and Officer Leyba had Plaintiff's right hand pinned to the back of his head, and Officer Valentine was holding Plaintiff's legs. (*Id.* at 11.)

While in hindsight, and in light of the BWC evidence, the potential threat Plaintiff posed even at the start of the encounter appears minimal, there is a question of fact whether a reasonable officer would have perceived Plaintiff to be an immediate threat to the safety of the officers and others when Defendant first took hold of Plaintiff, spun him around, pressed him against the fence, and took him to the ground. However, by the time Defendant delivered his brachial stuns and used his taser on Plaintiff, who was prone on the ground with Defendant atop him and other officers holding his legs and both hands, no reasonable officer would have perceived a threat from Plaintiff. *See, e.g.*, *Hyde v. City of Willcox*, 23 F.4th 863, 870-71 (9th Cir. 2022) (finding "the need for more force waned as circumstances changed" and that two minutes after Hyde was handcuffed and shackled, officers should have recognized that Hyde had effectively stopped resisting and posed no threat to the officers surrounding him giving the officers time to reassess their use of force); *Tucker v. Las Vegas Metro. Police Dep't*, 470 F. App'x 627, 629 (9th Cir. 2020) (holding that a jury could "reasonably conclude that the officers used excessive force in tasing Keith and applying their body pressure to restrain him after he was handcuffed and face down on a bed").

**iii. Resisting Arrest or Fleeing**

Defendant argues that Plaintiff disregarded numerous commands, actively resisted the officers by tensing his muscles, interlocking his fingers in a closed fist, pushing back, twisting and pulling away from officers and continuing to twist pull away and pull his hands under his body while on the ground. (Doc. 57 at 16.)

Plaintiff responds that he was arrested for passive resistance, that the video evidence belies that he was engaged in active resistance, and Defendant admitted that Plaintiff did not swing at him, push him, or even take a fighting stance. (Doc. 61 at 9.) Plaintiff contends that before he was taken to the ground, the video evidence shows his hands were never together or interlocked, he did nothing more than tense up and clench his fists while

they were at his side, that Defendant took full control of Plaintiff after forcing Plaintiff's hands down, that Plaintiff was not twisting, pushing or pulling away, and Defendant spun Plaintiff around, put his arm around Plaintiff's neck, pushed him against the fence, and slammed him to the ground while in complete control of Plaintiff. (*Id*. at 9-10.) Once he was on the ground, Plaintiff argues there is no genuine dispute that he was attempting to evade arrest by flight or that he was resisting, passively or actively. (*Id*. at 12.) Plaintiff asserts that Defendant's weight was on him, his hand was pinned under him by Defendant's weight, and Defendant and Officers Valentine and Leyba had control of Plaintiff when Defendant struck him multiple times. (*Id*.) Then, when Defendant and Officer Leyba had Plaintiff's hands pinned to the back of his head and Officer Valentine was holding Plaintiff's legs, Defendant tased him, even though he was not actively resisting and was helpless. (*Id*.)

The events on the video happened too quickly to clearly determine whether Plaintiff was resisting Defendant at any point after Defendant grabbed him. As noted, only five seconds elapsed between the time Defendant initially told Plaintiff to put his hands down and grabbed Plaintiff's hands and when Defendant pulled Plaintiff to the ground. In these few seconds, Defendant is seen pushing down on Plaintiff's hands, moving Plaintiff backwards a few feet, possibly dropping Plaintiff's hands before raising his knee toward Plaintiff's midsection, turning Plaintiff around, putting his arm around Plaintiff's neck, and pushing him against a fence. It is possible Plaintiff pushed back against Defendant before the knee strike, but events happen too quickly in the video to tell for sure. Defendant and Plaintiff are against the fence for only a moment before Defendant pulls Plaintiff off the fence and takes Plaintiff to the ground as another officer appears on camera to assist and holds down Plaintiff's legs. Again, events are happening quickly, and it is not possible to clearly see what happened while Plaintiff was against the fence or if Plaintiff was resisting before Defendant took him to the ground. But approximately five seconds total elapsed between the time Defendant initially grabbed Plaintiff's hands and pulled him to the ground, and no commands are heard from Defendant until Plaintiff had been on the ground

for several seconds.

Once they are on the ground, Defendant is seen straddling or sitting on Plaintiff's midsection, and Plaintiff appears to be laying mostly on his right side with Defendant atop him with Plaintiff's right hand pinned under his body and his left hand behind his back or head. Another officer is holding Plaintiff's legs. Defendant repeatedly orders Plaintiff to give him his hand, and Plaintiff's right hand comes out from under him. Officers' hands are then seen holding Plaintiff's right and left hands to the back of his head and appear to be in full control of Plaintiff's hands, but Defendant continues to yell for Plaintiff to give him his hand, and then Defendant tases Plaintiff and officers handcuff Plaintiff.

While there are disputed issues of fact whether Plaintiff offered any resistance prior to being taken to the ground, once on the ground, there can be no dispute, based on the video evidence, that Plaintiff complied with the order to give Defendant his hand once he was able to, officers had control of Plaintiff's hands, yet Defendant still tased Plaintiff. A reasonable jury could conclude that Plaintiff's noncompliance was passive and did not pose an immediate threat justifying the use of force. *See Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) ("a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force"); *Deorle*, 272 F.3d at 1281 (shooting a beanbag projectile at a suicidal, irrational individual who was walking directly towards an officer was excessive, given that the crime he committed was minor, the danger to the officer and others was minimal, there was no immediate need to subdue him, and he was not given any warning that he would be shot if he continued to approach the officer); *Bryan*, 630 F.3d at 826–28 (finding an unarmed man engaging in erratic but nonviolent behavior and shouting expletives at officers from 15 to 25 feet away does not constitute an immediate threat justifying the use of intermediate force (taser)); *Winterrowd v. Nelson*, 480 F.3d 1181, 1185 (9th Cir. 2007) (finding that verbal objections to being arrested and a "belligerent attitude," where the arrestee claimed he was neither threatening nor physically abusive, posed no physical danger and thus could not justify slamming the arrestee against the hood of a car); *Smith*,

394 F.3d at 702 (finding an uncooperative arrestee who shouted expletives at officers, refused to turn around and place his hands on his head, and physically resisted for a brief time was not an immediate threat justifying the use of intermediate force).

**c. Whether the Force Used was Necessary**

In this analysis, courts

> must balance the force used against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." Generally, deadly force is not permissible "unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." But even non-deadly force must not to be deployed lightly. Force "is permissible only when a strong government interest compels" the degree of force used.

*Scott v. Smith*, 109 F.4th 1215, 1225 (9th Cir. 2024) (citations omitted).

In addition, the Ninth Circuit has held that an "important consideration" in evaluating the government's interest in the use of force is "'whether officers gave a warning before employing the force.'" *Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017) (quoting *Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011)). In *Glenn*, the Ninth Circuit determined that "'[a]ppropriate warnings comport with actual police practice' and 'such warnings should be given, when feasible, if the use of force may result in serious injury.'" 673 F.3d at 876 (quoting *Deorle*, 272 F.3d at 1284).

Here, Defendant used escalating degrees of force against an individual who was waving his hands near Defendant's face and not leaving the area of the bar after police told him repeatedly to leave. Defendant had just told Plaintiff he was not in any trouble but then when Plaintiff continued talking about the incident in the bar and waving his hands near Defendant's face, Defendant told Plaintiff to put his hands down and immediately grabbed Plaintiff's hands or wrists, delivered a knee strike, pushed Plaintiff against a fence, and then forcefully took Plaintiff to the ground. Defendant did not tell Plaintiff he was under arrest or to put his hands out to be handcuffed before he grabbed Plaintiff and set the events in motion that ended up with Defendant tasing Plaintiff. It was not until Plaintiff

was already on the ground that Defendant gave any commands to give his hands and warned Plaintiff that he would tase him.

Based on these facts and the video evidence, there is a question of fact whether any force was necessary initially to obtain Plaintiff's compliance. However, a reasonable jury could conclude that once Plaintiff was on the ground and pinned down by Defendant and other officers and both hands were being held to his held, there was no need for Defendant to use the brachial stun compliance technique or taser. *See Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130–31 (9th Cir. 2017) ("By the time Jones was prone and surrounded by multiple officers, there would have been no continuing justification for using intermediate force: Jones was on the ground after his body 'locked up' as a result of repeated taser shocks; he had no weapon and was making no threatening sounds or gestures").

Based on this record, there are genuine issues of material fact whether Defendant violated Plaintiff's Fourth Amendment rights precluding the grant of summary judgment to Defendant.

**3. Qualified Immunity**

Defendant argues that he is entitled to qualified immunity because officers may use reasonable force to detain or arrest. (Doc. 57 at 9.)

A defendant in a § 1983 action is entitled to qualified immunity from damages for civil liability if his conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis requires the court to make two distinct inquires, the "constitutional inquiry" and the "qualified immunity inquiry." *See Est. of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002). The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The "qualified immunity inquiry" asks if the right was clearly established at the relevant time. *Id.* at 201–02.

Plaintiff bears the burden of identifying a case where an officer acting under similar factual circumstances was held to have violated the constitution. *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017). "[T]he prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). For a right to be clearly established there does not have to be a case directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2017)). A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 580 U.S. at 79).

Here, the Court has already found questions of fact regarding whether Defendant violated Plaintiff's Fourth Amendment rights. Therefore, the qualified immunity analysis focuses on whether the right was clearly established when Defendant encountered Plaintiff in September 2021.

Plaintiff argues that "the law was clearly established at the time that [Defendant's] takedown, striking and tasing of [Plaintiff] were excessive uses of force." (Doc. 61 at 13.) Plaintiff cites four cases in support of his argument: *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013) ("The right to be free from the application of non-trivial force for engaging in mere passive resistance" was clearly established and an officer's tasing of a bystander to an arrest who did not retreat despite the officer's orders violated clearly established law); *Rice v. Morehouse*, 989 F.3d 1112, 1121, 1125 (9th Cir. 2021) (finding that motorist who refused to give officers his license or exit his car was engaged in passive resistance and reversing summary judgment on the basis of qualified immunity to officers who pulled the motorist out of his car, threw him to the ground, repeatedly struck and kneed him, and wrenched his arms and shoulders); *Mattos*, 661 F.3d at 443 (finding that a

reasonable fact-finder could conclude that police officers violated the Fourth Amendment rights of an agitated and uncooperative, but non-threatening, motorist when they used a taser in drive stun mode multiple times against the motorist but concluding that qualified immunity applied because the right was not clearly established at the time of the incident in 2004); and *Blankenhorn*, 485 F.3d at 482 (finding it clearly established in 2001 that gang-tackling, punching and using hobble restraints "without first attempting a less violent means of arresting a relatively calm trespass suspect—especially one who had been cooperative in the past and was at the moment not actively resisting arrest—was a violation of that person's Fourth Amendment rights" and officers were not entitled to qualified immunity).

In *Young v. County of Los Angeles*, the court denied qualified immunity to an officer who physically struck and used pepper spray against an arrestee who refused to reenter his vehicle. 655 F.3d 1156, 1158, 1168 (9th Cir. 2011) (holding that "[t]he principle that it is unreasonable to use significant force against a suspect who was suspected of a minor crime, posed no apparent threat to officer safety, and could be found not to have resisted arrest" was well established long before 2007). In the 2010 case of *Bryan*, the court denied qualified immunity to an officer who tased a motorist who had been shouting gibberish, hitting himself, and disobeying the officer's instructions to reenter his car, but was otherwise non-resistant. 630 F.3d at 833.

In this case, the law was clearly established by 2021 that an officer may not use moderate to intermediate force by throwing to the ground and breaking the nose of an arrestee who was suspected of minor crimes, posed no apparent threat to the officer, and had not been notified he was under arrest and to submit to handcuffs. In addition, the law was clearly established by 2021 that an officer may not use brachial stuns and a taser on an arrestee who was fully subdued by multiple officers and incapable of resisting by the time the brachial stuns and taser were used. Accordingly, Defendant is not entitled to qualified immunity, and the Court will deny summary judgment to Defendant on Plaintiff's Fourth Amendment claim.

### C. First Amendment

Plaintiff alleges in his Second Claim for Relief that he was engaged in constitutionally protected activity, namely the right to freedom of speech, when he questioned Defendant outside Casa Amigos and suggested to Defendant that he was not speaking to him in his "actual" voice. (Doc. 1 ¶ 25.) Plaintiff alleges that Defendant's uses of force against him would chill a person of ordinary firmness from continuing to engage in the protected activity, that Plaintiff's questioning of and comments toward Defendant were substantial and motivating factors in Defendant's decision to use force against him, that Defendant's conduct was driven by an evil motive or intent or, alternatively, that Defendant's conduct amounted to a callous or reckless indifference to Plaintiff's constitutional rights, and Plaintiff suffered injuries and damages including pain, discomfort, suffering, disability, disfigurement, anxiety, a left frontal scalp hematoma and a displaced nasal bone fracture. (*Id.* ¶¶ 26-27, 29-30.)

Defendant asserts qualified immunity for the First Amendment retaliation claim in a section hearing, but otherwise the motion does not provide argument or analysis on this issue. (Doc. 57 at 17), Despite this, the Court construes Defendant's motion as arguing that summary judgment should be granted in favor of qualified immunity.

Summary judgment in favor of qualified immunity is not proper unless the evidence permits only one reasonable conclusion. *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000). If there is a material dispute as to the facts regarding what either party did, then "the case must proceed to trial, before a jury if requested." *LaLonde v. County of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000).

Defendant asserts no First Amendment violation occurred because he had probable cause to arrest Plaintiff. (Doc. 57 at 18.) A successful First Amendment retaliatory arrest claim usually requires a showing that the officers had no probable cause for the arrest. *See Nieves v. Bartlett*, 587 U.S. 391, 405 (2019). But Defendant's argument fails because Plaintiff does not claim retaliatory *arrest* based on his speech, but for retaliatory *conduct*—the physical altercation. (Doc. 61 at 14.) As Plaintiff never made a retaliatory arrest claim,

*Nieves* does not govern his retaliation claim.

To demonstrate a First Amendment free speech violation, "a plaintiff must provide evidence showing that by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct." *Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999) (internal citation and quotation omitted). A plaintiff does not need to demonstrate that his speech was inhibited or suppressed but only requires "a demonstration that defendants *intended* to interfere with [the plaintiffs'] First Amendment rights." *Id.* (internal citation and quotation omitted) (emphasis in original).

As to retaliation claims, generally, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. *Nieves*, 587 U.S. at 398; *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out). Accordingly, "[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Hous., Tex. v. Hill*, 482 U.S. 451, 461 (1987). "The freedom of individuals to oppose or challenge police action verbally without thereby risking arrest is one important characteristic by which we distinguish ourselves from a police state." *Id.* at 463. "Thus, while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990).

To recover under § 1983 for such retaliation, a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) (citations omitted).

Defendant argues there is no doubt that probable cause existed to arrest Plaintiff, who reapproached Defendant and became increasingly animated and aggressive, swiftly thrusting his hands within inches of Defendant face, taser, trauma shears and folding knife, and was highly intoxicated, angry, fighting, pushing, and shoving other members of his group. (Doc. 57 at 18.) Defendant argues that Plaintiff was given several lawful orders to not raise his hands in Defendant's face and to not touch other officers and that the crimes Plaintiff was committing or had just committed at the time of his arrest are not constitutionally protected activities. (*Id*.) Defendant further argues that Plaintiff had not produced any evidence that Defendant acted with any retaliatory animus or that the substance of Plaintiff's speech was a motivating factor to arrest him or that a retaliatory motive was the but-for cause of his arrest. (*Id*.)

Plaintiff responds that he is not asserting a retaliatory arrest claim and that the retaliatory conduct he is complaining of is the knee strike, push into the fence, slamming him to the ground, and striking and tasing him. (Doc. 61 at 14.) Plaintiff asserts that he meets the first element of a First Amendment claim when he questioned why Defendant was not investigating the false accusations made against Plaintiff, and Plaintiff accused Defendant of speaking to him in a demeaning tone and not using his actual voice. (Doc. 61 at 15.) Plaintiff asserts that the force used against him would chill a person of ordinary firmness from continuing to engage in First Amendment activity. (*Id*.) Plaintiff argues that circumstantial evidence supports the third element when in the middle of Plaintiff's verbal challenges, Defendant "went hands on, ultimately slamming [Plaintiff] to the ground, striking him and tasing him." (*Id*. at 15-16.)

Defendant replies that Plaintiff's failure to obey lawful orders, aggressive behavior and resisting attempts to take him into custody are not constitutionally protected activities, there is no evidence Defendant acted with retaliatory animus in arresting Plaintiff or in meeting Plaintiff's active resistance with graduated escalation of force interventions until the arrest was completed, or that the substance of Plaintiff's speech was the but-for cause of the decision to arrest him or use any of force compliance techniques. (Doc. 64 at 4.)

Defendant argues that he was again ordering Plaintiff to put his hands down at the moment he initiated the arrest for actively failing to obey his previous orders and there is no evidence Defendant was motivated to arrest Plaintiff for any reason beyond Plaintiff's own criminal conduct. (*Id*.)

Here, Plaintiff was engaged in the constitutionally protected activity of questioning Defendant about the incident in the bar, satisfying the first element of a First Amendment claim. The second, adverse action element is also satisfied by the arrest of Plaintiff, which involved grabbing Plaintiff, kneeing him, slamming him against the fence and then to the ground, striking him and then tasing him. Such actions would chill a person of ordinary firmness from continuing to engage in the protected activity. There is a question of fact regarding the third element and whether Defendant engaged in the adverse action because of Plaintiff's protected speech. Defendant was clearly exasperated with Plaintiff and a reasonable jury could conclude that is the reason Defendant grabbed Plaintiff as opposed to Plaintiff continuing to wave his hands near Defendant when Defendant told him not to.

As for clearly established law, the Supreme Court and Ninth Circuit Court of Appeals have found that the right to verbally challenge police is established. *Hill*, 482 U.S. at 462-63 ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1174 (9th Cir. 2013) (police "may not use the awesome power which they possess to punish individuals for conduct that is not only lawful, but which is protected by the First Amendment"); *see also Winterrowd*, 480 F.3d at 1185 (finding that when a suspect has not been dangerous in past encounters with the police, the suspect's criticism of the police does "not justify the use of force"); *Ford v. City of Yakima*, 706 F.3d 1188, 1196 ("*Duran* clearly established that police officers may not use their authority to punish an individual for exercising his First Amendment rights. . ."), *abrogated in part by Nieves*, 587 U.S. 391.

Based on this record, the Court will deny summary judgment to Defendant on Plaintiff's First Amendment claim.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendant's Motion for Summary Judgment (Doc. 57).

(2) Defendant's Motion for Summary Judgment (Doc. 57) is **denied**.

(3) This action is referred by random lot to United States Magistrate Judge John Z. Boyle for the purpose of conducting a settlement conference.

(4) The parties must jointly contact the chambers of Magistrate Judge Boyle at (602) 322-7670 within 14 days of the date of this Order to schedule a settlement conference.

(5) A trial setting conference is set for Wednesday, June 24, 2025 at 1:00 p.m. before United States District Judge Michael T. Liburdi in Courtroom 504, Sandra Day O'Connor United States Courthouse, 401 West Washington Street, Phoenix, Arizona 85003. Counsel must appear in-person and be prepared to discuss scheduling a trial for this matter.

Dated this 30th day of May, 2025.

Michael T. Liburdi

Michael T. Liburdi
United States District Judge